# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSE M. SOTO GARCIA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, | : | |
| Acting Commissioner of | : | |
| Social Security | : | NO. 22-4695 |

**O P I N I O N**

SCOTT W. REID                                                    DATE: September 22, 2023
UNITED STATES MAGISTRATE JUDGE

Jose M. Soto Garcia ("Soto") brought this action under 42 U.S.C. § 405(g) to obtain review of the decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB"). He has filed a Request for Review to which the Commissioner has responded. As explained below, I conclude that the Request for Review should be denied and judgment entered in favor of the Commissioner.

I.      *Factual and Procedural Background*

Soto was born on January 16, 1971. Record at 208. He completed high school. Record at 229. He worked in the past as an assembler in an iron foundry, in building maintenance, and as a butcher. Record at 230.

On January 28, 2020, Soto filed an application for DIB. Record at 208. He asserted disability as of May 13, 2019, as a result of diabetes, obesity, gout, varicose veins, edema, metabolic syndrome, sleep apnea, bilateral knee pain, disorders of the right shoulder and bicep, and an anxiety disorder. Record at 208, 228.

Soto's application for benefits was denied initially on May 14, 2020. Record at 64. On October 15, 2020, it was denied again upon reconsideration. Record at 77. Soto then requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). Record at 91.

A hearing was held in this matter on May 12, 2021. Record at 39. On May 28, 2021, however, the ALJ issued a written decision denying benefits. Record at 21. The Appeals Council denied Soto's request for review on September 29, 2022, permitting the ALJ's decision to serve as the final decision of the Commissioner of Social Security. Record at 1. Soto then filed this action.

II.   *Legal Standards*

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389 (1971); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence which a reasonable mind might deem adequate to support a decision. *Richardson v. Perales*, *supra*, at 401. A reviewing court must also ensure that the ALJ applied the proper legal standards. *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984); *Palmisano v. Saul*, Civ. A. No. 20-1628605, 2021 WL 162805 at *3 (E.D. Pa. Apr. 27, 2021).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. §423(d)(1). As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration

> requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

20 C.F.R. §404.1520(4) (references to other regulations omitted).

Before going from the third to the fourth step, the Commissioner will assess a claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence in the case record. *Id*. The RFC assessment reflects the most an individual can still do, despite any limitations. SSR 96-8p.

The final two steps of the sequential evaluation then follow:

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make the adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

*Id*.

III.   *The ALJ's Decision and the Claimant's Request for Review*

In his decision, the ALJ determined that Soto suffered from the severe impairments of degenerative joint disease, diabetes, and obesity. Record at 23. He did not find that any of these impairments met or medically equaled a listed impairment. Record at 25.

The ALJ found that Soto retained the RFC to perform light work, except that he could only frequently (as opposed to continually) balance and stoop; could only occasionally climb ramps or stairs or crouch; could never climb ladders, ropes or scaffolds; and could never kneel or crawl. Record at 26.

In reliance upon a vocational expert who appeared at the hearing, the ALJ found that Soto could not return to his prior work, but could work in such jobs as machine feeder, press feeder, or products sorter.  Record at 34.  He determined, therefore, that Soto was not disabled.  *Id*.

In his Request for Review, Soto argues that the ALJ erred in (a) misstating his testimony regarding the severe osteoarthritis in his knees; (b) wrongly assessing the level of treatment required to treat his knees; and (c) failing to consider the effect of his severe obesity on his knee impairments.  He also argues that the ALJ erred in finding that his activities of daily living were inconsistent with his subjective complaints.

IV.    *Discussion*

    A.    *The ALJ's Treatment of the Evidence as to Soto's Knees*

        1.    *The Medical Opinion Evidence*

As the ALJ acknowledged, objective medical evidence – most recently, x-rays from May 2020 – demonstrates that Soto suffered from degenerative joint disease in both knees, worse on the right.  Record at 736.  There are numerous medical treatment notes in the file from physical therapy, Soto's general practitioner, and an orthopedist, pertaining to his knees.

However, neither Soto's treating physicians nor his physical therapist submitted evidence as to the functional limitations arising from the condition of his knees, such as the amount of time he could stand or walk.  The only evidence in the file in this regard is from agency physicians who never examined Soto, but reviewed his medical records.

Joanna DeLeo, D.O., the initial agency consulting physician opined on May 11, 2020, that Soto retained the functional capacity to stand or walk for six hours in an eight-hour workday.  Record at 60.  She cited medical evidence from March 6, 2020, which indicated that

Soto had 5/5 strength and range of motion in his knees despite crepitus (crackling noises). Record at 61.

On reconsideration, Michael Mesaros, Jr., M.D., reviewed the records Dr. DeLeo saw, and was also able to see medical records from May and June 2020. Record at 73. He agreed with Dr. DeLeo that Soto would be able to stand and/or walk about six hours in an eight-hour workday. Record at 72. However, unlike Dr. DeLeo, who indicated that Soto had no postural limitations, Dr. Mesaros specified that Soto could never kneel, crawl, or climb ladders or scaffolds; only occasionally crouch or climb stairs; and could stoop frequently, but not continually. *Id*.

The ALJ found "persuasive" both of the reports from the agency reviewing physicians, although he found that of Dr. Mesaros "more persuasive," and included in his RFC assessment the postural limitations Dr. Mesaros suggested. Record at 32-33.

There were no other medical opinions for the ALJ to consider. Therefore, it would be difficult to find at this level of review that the ALJ's RFC assessment was unsupported by substantial evidence unless the assessments of Drs. DeLeo and Mesaros were grossly inconsistent with the other evidence of record. As discussed below, this is not the case. While the ALJ's opinion was not perfect, the evidence of record largely supports his RFC assessment.

  2. *Soto's Testimony*

The ALJ's decision sets forth at length Soto's description of his own knee symptoms and their results, both as set forth in the Functional Report and other documents he submitted as part of his application for benefits, and in his testimony at the hearing. Record at 26-7. Soto makes much of the fact that the ALJ did not distinguish clearly between the information taken from the

5

Functional Report, and Soto's statements at the hearing, describing it all as "testimony." He argues:

> There is a great distinction between reports and testimony. Not only are the reports older, chronologically, than the hearing testimony but a review of the reports in this case show that they were not completed by the plaintiff, but by third parties, or if they were allegedly completed by the plaintiff, were not signed.

*Plaintiff's Brief* at 9.

The distinction between reports and the hearing testimony is not as great as Soto argues. They all set forth Soto's allegations. The Function Report was signed by a Lorna Rivera, almost certainly because Soto can read and write only in Spanish, and the form is in English. Record at 241, 254, *and see* 227 ("Can you read and understand English?  No; Can you write more than your name in English?  No").  However, it was clearly completed for Soto's benefit, and there is no reason to believe it is not an accurate translation of statements made by him to Ms. Rivera. Soto has not alleged otherwise. Similarly, although the Disability Reports are unsigned, Soto does not assert that they were inaccurate or falsified. Record at 227, 284, 294. Thus, it was reasonable for the ALJ to refer to the contents of these forms as Soto's "testimony," even though they were not oral statements made before the ALJ.

The second point Soto makes – that his testimony at his hearing was subsequent to his written statements, so that the condition of his knees could have deteriorated by then – is more substantial. In Soto's Function Report, dated March 12, 2020, he indicated that he could walk for one hour on a flat surface, and stand up to one hour at a time without pain. Record at 246, 251. Even earlier than that, on November 29, 2019, Soto told his physical therapist that "walking more than two hours increased his knee pain." Record at 642. At the May 12, 2021, hearing, however, Soto told the ALJ that he could only walk five or ten minutes without pain. Record at 45.

However, there is no evidence of a striking deterioration in the condition of Soto's knees in the year between the filing his Function Report and his hearing before the ALJ.  The most recent medical record in the file is a set of treatment notes from Soto's orthopedist dated December 8, 2020, and although they reflect an antalgic gait, they also state that Soto was not taking any pain medication for his knees, even though his last cortisone injection for pain control was six months earlier.  Record at 760, 761.  Further, the orthopedist noted that Soto's knee pain was aggravated by going up and down stairs.  Record at 760.  This would have been accommodated by the RFC limitation to only occasional stair-climbing.  Record at 26.

Thus, Soto has not pointed to any objective evidence in support of his speculation that the discrepancy between his representations in his Function Report and his testimony could have been cause by deterioration in his knees over time.  On the contrary, the December 8, 2020, treatment notes suggest that there was no dramatic change within the relevant time period.  Soto has not, therefore, shown that the ALJ erred in this regard.

      3.     *The Level of Treatment for Soto's Knees*

The December 8, 2020, treatment note from Soto's orthopedist contains this text:  "Plan: I discussed treatment options with the patient, both conservative and surgical.  I told him I would prefer to avoid surgery in him given his obesity and young age.  He understood and he does wish to get injections again in his left knee.  We will ask for viscosupplementation."  Record at 761.  The ALJ summarized this note in his decision, and then wrote:  "As for the effectiveness of treatment, it is reasonable to conclude that treatment is effective in light of the fact that no alternative treatment has been sought or recommended."  Record at 31.

As Soto points out, the ALJ's statement was not accurate. Obviously, the orthopedist recommended further treatment in the form of viscosupplementation. Further, the orthopedist's note does not preclude the possibility that the condition of Soto's knees might have warranted surgery, if Soto had been older and had weighed less.

Nevertheless, this inaccuracy does not warrant remand. Dr. Mesaros's report predated this latest orthopedist note, but an earlier treatment note informed him that Soto was treated with cortisone injections, and that if they were unsuccessful, viscosupplementation would be recommended. Record at 73, 735 (Orthopedist note dated May 5, 2020). Although the orthopedist's apparent decision to proceed with viscosupplementation might indicate a deterioration in Soto's condition, there is no evidence that Soto actually had this treatment. Soto testified at his hearing that he was still treating with twice-yearly cortisone injections. Record at 46. He did not mention viscosupplementation, and there is no medical record of his having received it.

Therefore, the level of treatment of which Dr. Mesaros was aware was the same level of treatment Soto was receiving at the time of his hearing. Dr. Mesaros nevertheless found that Soto was capable of standing for six hours in an eight-hour workday, and could therefore perform light work, with postural limitations which were adopted by the ALJ. Record at 72. No physician or physical therapist opined to the contrary.

Given the foregoing, it is clear that, even if the ALJ's inaccurate statement is taken into account, his conclusion that Soto could perform light work with certain postural limitations is still supported by substantial evidence.

4.  *Soto's Obesity*

At the second step of the sequential evaluation, the ALJ found Soto's obesity to constitute a severe impairment. Record at 23. He considered Soto's obesity again at the third step of the evaluation, writing:

> There are no specific Listings for diabetes mellitus or obesity, and there is no indication in the medical evidence of record that either of these conditions significantly affect any other body systems. Furthermore, there is no indication in the medical evidence of record that the severity of these impairments increases the severity of the claimant's coexisting impairments to the extent that the combination of impairments either meets or medically equals the requirements of a Listing.

Record at 25-6.

Soto argues that this was insufficient, and that the ALJ should have discussed the impact of his obesity later in his decision, in assessing his RFC. It is not precisely clear from the caselaw how much discussion of obesity is enough to permit adequate review, or at what stage of review the discussion should take place. There are cases in which courts have indicated that a discussion of obesity is necessary at the RFC stage. *See*, e.g., *Buchanan v. Colvin*, Civ. A. No. 11-4597, 2014 WL 351577 at *3 (E.D. Pa. 2014) (case remanded where ALJ did not "clarify how plaintiff's obesity factored into her decision as to plaintiff's residual functional capacity").

Despite this, most courts have found that an ALJ's error in this regard warrants remand only where the record contains evidence that the ALJ failed to consider, and which would affect the ALJ's conclusion as to the effects of obesity on the claimant's functional capacity. In *West v. Berryhill*, for example, the court cited *Buchanan* in finding that an ALJ's discussion of obesity was inadequate, but did not order remand because the record evidence did not support the conclusion that the claimant's evidence rendered him unable to work. Civ. A. No. 16-334, 2018 WL 1726615 at *6 (E.D. Pa. Apr. 10, 2018).

9

Here, unlike in *West*, there was at least one medical report which alluded to Soto's obesity as affecting his limitations; on May 5, 2020, Soto's orthopedist recommended that he lose weight. Record at 736. However, Dr. Mesaros was aware of this note: "5/5/20 Plan: lose weight." Record at 73. He nevertheless found Soto capable of a limited range of light work. The ALJ also mentioned the recommendation to lose weight in his decision. Record at 30. Because both the ALJ, and the doctor upon whose findings he relied, were aware of this recommendation, it can be assumed that they incorporated it into their RFC findings.

Crucially, Soto has not pointed to any relevant evidence beyond that which was mentioned in the ALJ's decision. Mere speculation that a more extensive consideration of Soto's obesity would have resulted in a more restrictive RFC assessment is insufficient to warrant remand. *Rutherford v. Barnhart*, 399 F.3d 546, 552-3 (3d Cir. 2005); *Cosme v. Commissioner of Soc. Sec.*, 845 F. App'x 128 132 (3d Cir. 2021) (a "generalized response" that obesity would affect another impairment is insufficient to obtain relief); *Carter v. Commissioner of Soc. Sec.*, 805 F. App'x 140, 143 (3d Cir. 2020) (a petitioner must establish not only that "obesity can impair one's ability to perform basic work activities," but must also "specify[] how her obesity … affected her ability to perform basic work activities").

Put another way, remand is not available where a petitioner has not pointed to any relevant evidence which the ALJ failed to consider, since that would be to "remand the ALJ's decision based on the failure to confront evidence that does not exist." *West v. Berryhill*, *supra*, quoting *Neff v. Astrue*, 875 F. Supp.2d 411, 423 (D. Del. 2012); *Lerner v. Commissioner of Soc. Sec.*, Civ. A. No. 21-4073, 2022 WL 2666961 at *5 (D.N.J. July 8, 2022), also quoting *Neff*.

B.    *Soto's Activities of Daily Living*

Finally, Soto argues that the ALJ erred in finding that his activities of daily living were inconsistent with his subjective complaints. The Commissioner argues in response that there is nothing wrong in looking to a claimant's activities of daily living in assessing his subjective representations and assessing his RFC. In fact, the regulations direct an ALJ to consider activities of daily living in this context. 20 C.F.R. §416.929(c)(3)(i); *and see* SSR 96-8p.

ALJs can at times err in assuming that a claimant who does more than "vegetate in a dark room excluded from all forms of human social activity" is necessarily able to perform full-time work. *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981); *Nazario v. Commissioner Soc. Sec.*, 794 F. App'x 204, 212 (3d Cir. 2019) (non-precedential). Nevertheless, this does not mean that a claimant's daily activities are irrelevant to his RFC. In a non-precedential case, the Court of Appeals for the Third Circuit wrote: "Although certainly '[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity,' … it is nonetheless appropriate for the ALJ to consider the 'number and type of activities' in which the claimant engages." *Turby v. Barnhart*, 54 F. App'x 118, 122 n.1 (3d Cir. 2002), *quoting Smith* and *Burns v. Barnhart*, 312 F.3d 113, 130-1 (3d Cir. 2002).

Here, the ALJ wrote:

> The claimant reported rather normal activities of daily living stating that he performs personal care such as dressing, bathing, shaving, caring for his hair, feeding himself, and using the toilet with no problems, shopping in stores, driving, preparing meals, caring for his daughter, caring for the cat, visiting with others, reading, watching television, clearing, washing the dishes, using a blower [by which Soto very likely meant a vacuum cleaner], mopping with a Swiffer, taking out the trash, attending church, and attending picnics/cook outs … . The ability to perform such a wide range of activities is not consistent with totally debilitating limitations of function. In fact, it is consistent with the ability to engage in some types of work activity.

Record at 31-2.

Some of the above is irrelevant to whether Soto can stand and walk, and was no doubt intended to address impairments other than the deterioration in his knees. However, some activities, such as shopping and housework, are clearly relevant and were rightly considered by the ALJ.

Thus, the ALJ's statement that Soto's activities of daily living were consistent with the ability to do some type of work is reasonably well supported by substantial evidence. Further, although the ALJ did not comment on this, Soto stated in his Function Report that he was not only able to attend worship services regularly, but regularly went "house to house to talk about the Bible." Record at 250, *and* see Record at 276 (Third-party Function Report completed by Soto's wife: "[Soto could regularly] go house to house to talk about the Bible with the people"). This obviously involves a certain amount of standing and walking.

As to what type of work Soto could perform, the only two medical opinions in the file – those of Drs. DeLeo and Mesaros – indicated that a limited range of light work was appropriate. Their opinions are not clearly inconsistent with the other evidence of record, and the ALJ was therefore entitled to rely upon them.

V.        *Conclusion*

In accordance with the above discussion, I conclude that the Plaintiff's Request for Review should be DENIED, and judgment entered in favor of the Commissioner.


BY THE COURT:


*/s/ Scott W. Reid*

_____
SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE